**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LM INSURANCE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 0522 |
| | ) | |
| PAYCENTER, INC. et al. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER AND OPINION**

MARVIN E. ASPEN, District Judge:

Presently before us is Plaintiff LM Insurance Corporation's ("LM") Motion for Partial

Summary Judgment against Defendant Midwest Insurance Agency, Inc. ("Midwest"). LM

alleges that Midwest negligently failed to perform its obligations as an insurance producer and

misrepresented and omitted certain facts to LM pertinent to a workers' compensation policy it

managed for Midwest's client, Defendant Paycenter, Inc. ("Paycenter"). LM seeks a judgment

against Midwest for Counts 14 and 15 of the Amended Complaint, in the amount of $2,895,082.

For the reasons set forth below, we deny the motion.

**SUMMARY OF FACTS**[1]

LM is an Iowa corporation authorized to engage in the insurance industry here in Illinois.

(Pl.'s Facts ¶ 1.) Although Paycenter allegedly started out as a specialized temp agency, at some

point it began functioning as an employee leasing company, or professional employer

---

[1] Unless otherwise noted, the facts described herein are undisputed. Where the parties
dispute the phrasing of a particular Statement of Fact, we shall rely on the documentary evidence
to the extent appropriate.

organization ("PEO"). (*Id.* ¶ 13; Def.'s Facts ¶ 2-3.) PEOs provide human resources-related

services for their client companies. (Pl.'s Facts ¶ 13.) Defendant Louis J. Quilici ("Quilici, Jr.")

was the president of Paycenter. (Def.'s Facts ¶ 3.) Prior to forming Paycenter, Quilici, Jr. and

his family members (though perhaps in varying combinations) owned and ran other PEOs,

Employee Management Corporation ("EMCO") and Employee Management Corporation of

Illinois ("EMCO-IL"). (Pl.'s Facts ¶ 15.)

### A.   Midwest's Involvement in the Insurance Application Process

On or about April 16, 2004, Paycenter applied for workers' compensation insurance

through the Illinois Assigned Risk Plan ("the Plan").[2] (*Id.* ¶ 18.) Under the Plan, an employer is

ineligible for coverage if it "has an outstanding workers compensation insurance premium

obligation or other monetary policy obligation . . . that is not subject to a bona fide dispute."

(Pl.'s Facts, Ex. 29 at P 4406; *see also* Pl.'s Facts ¶ 33.) "Employer" is defined by the Plan to

include the insurance-seeking entity and "any business organizations or enterprises that are

affiliated as a result of common management or ownership." (Pl.'s Facts, Ex. 29 at P 4404.)

Midwest's account manager, Lucy Podgers, obtained information about Paycenter and

prepared its insurance application. (*Id.* ¶¶ 20-21.) As a result, and through the Plan's operation,

LM issued[3] a workers' compensation insurance policy (#WC5-34S-371817-014) to Paycenter,

---

[2] By way of background, and according to the Complaint, the Plan "is a set of rules governing the assignment, administration, and issuance of policies written for eligible employers." (Compl. ¶ 20.) "In Illinois, the National Council on Compensation Insurance, Inc. ('NCII') is the administrator of the plan," which obtains insurance on behalf of employer-applicants who are unable to purchase it through the voluntary market. (*Id.* ¶¶19-20.)

[3] LM contends that "[t]echnically, LM does not issue the policy, NCCI does, and assigns . . . the risk to LM." (Pl.'s Resp. to Def.'s Facts ¶ 19.) Mindful of this potential but non-material discrepancy, we will refer to LM as the issuer for simplicity's sake.

valid from April 18, 2004 through April 16, 2005 ("the Paycenter Policy"). (*Id.* ¶ 19.) William

Blackwell, a co-owner of Midwest, acted as the producer for the Paycenter Policy. (*Id.* ¶ 1.) In

the application, Midwest indicated that Paycenter is not "related through common management

or ownership to any entity not listed [thereon], whether coverage is required or not."[4] (*Id.* ¶ 28.)

Midwest made this representation despite the fact that Paycenter, EMCO and EMCO-IL "were

owned variously by Quilici family members" and not mentioned on the application. (Def.'s

Resp. to Pl.'s Facts ¶ 29.) According to his deposition testimony, Blackwell did not explore the

relationship between EMCO and Paycenter when processing the Paycenter insurance

application. (Pl.'s Facts, Ex. 16, Blackwell Dep. at 221-24; *see* Pl.'s Facts ¶ 30.) In other words,

he did not conduct any investigation into whether the two might be considered related entities

under the Plan's terms. (Pl.'s Facts ¶ 31; *see* Pl.'s Facts, Ex. 16, Blackwell Dep. at 223-24.) On

January 31, 2005, NCCI ruled that Paycenter was related to EMCO and EMCO-IL, along with

other companies owned by Quilici family members.[5] (Pl.'s Facts ¶ 34; Def.'s Facts ¶ 16.) This

---

[4] The parties dispute whether Blackwell executed the signature appearing on the "Producer's Certification" section of the insurance application, which requires the producer to certify the truth of the information contained therein. (Def.'s Resp. to Pl.'s Facts ¶ 32.)

[5] Midwest contends that LM internal investigators were on notice, as of July 2004, that Paycenter might be related to other Quilici-owned companies, particularly EMCO. (Def.'s Facts ¶¶ 14-15.) In support, Midwest cites generally to the deposition of a Liberty Mutual senior underwriter, Joy Holubets, and refers to an email written by Paul Holtrup, a Senior Forensic Consultant for LM. (*Id.*) Midwest's reference to an entire deposition transcript is inappropriate, particularly when the testimony therein does not support the factual assertion. *See, e.g.*, *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 (7th Cir. 2008) (observing that summary judgment litigants must assist the court with citations because "[j]udges are not like pigs, hunting for truffles buried in" the record); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (noting that the court need not scour the record "for facts that a party could have easily identified with greater particularity").
    Nonetheless, our review of the record indicates that Midwest should have referred to its Exhibit 7, which contains the Holtrup email at issue. (Def.'s Facts ¶ 14.) That email indicates

ruling provided for increased modification factors for all affected companies.  (Def.'s Facts ¶ 16.)

In addition to his role as insurance producer, Blackwell also referred clients to Quilici-owned PEOs, including Paycenter, for compensation – although the parties dispute whether or not he did so in his capacity as co-owner and/or employee of Midwest.  (Def.'s Resp. to Pl.'s Facts ¶ 23; *see* Pl.'s Facts, Ex. 11 at 3-4.)  Throughout 2004, for example, Louis I. Quilici ("Quilici, Sr."), father of Quilici, Jr., paid Blackwell a commission of $5,000 per week, representing one-half of one percent of the gross payroll of EMCO clients referred by Blackwell, and pursuant to an agreement reached between Blackwell and EMCO in 2003.  (Pl.'s Facts ¶ 24 & Ex. 9, Midwest's 2d. Am. Ans. to Pl.'s 2d Set of Interrogs. ¶ 3.)  Quilici, Sr. testified that he met Blackwell through his son.[6]  (*Id.* ¶ 25.)  On at least one occasion, Blackwell visited Quilici, Jr. at the Rockford, Illinois offices of EMCO and EMCO-IL.  (*Id.* ¶ 26.)  An EMCO employee testified that she performed work for Paycenter, EMCO and EMCO-IL at that Rockford office. (Def.'s Resp. to Pl.'s Facts ¶ 17.)

### B.    Midwest's Management of the Paycenter Policy

Pursuant to the Plan, Midwest and Blackwell had continuing obligations to LM after the Paycenter Policy was in place.  (Pl.'s Facts ¶¶ 35, 44-45, 50.)  First, the insurance producer must report "immediately to the assigned carrier all known changes in the employer's name,

---

that as of May 21, 2004, LM employees were aware that Louis Quilici presented a new insurance application under a new business name, and LM arranged for an audit within a few weeks. (Def.'s Facts, Ex. 7 at P 78.)  We have not found support for Midwest's Statement of Fact ¶ 15.

[6] Although Midwest contends that contrary evidence exists, it failed to properly cite to any such authority in the record.  (*Compare* Def.'s Resp. to Pl.'s Facts ¶ 25 *with* Pl.'s Facts, Ex. 16, Blackwell Dep. at 41.)

operations, ownership status, exposures, locations, financial condition or other changes which

may affect the policy or the services being provided." (Pl.'s Facts, Ex. 29 at P 4439.) Relatedly,

the producer shall keep the "policy up to date by promptly requesting endorsements as required."

(*Id.*; *see* Pl.'s Facts ¶¶ 43-45, 50.) Midwest's Blackwell acknowledged that the Plan requires the

producer "to report changes in exposure to the insurance company." (Pl.'s Facts, Ex. 16,

Blackwell Dep. at 18.) Such changes include changes to employee classification codes and

payroll. (*Id.* at 18-19.) The insurance company needs this information to calculate its exposure,

which is then used to set appropriate premium rates. (Pl.'s Facts ¶¶ 38-39.) When additional

coverage is requested and endorsed on a policy, the insurance company would increase the

premium charges for that coverage. (*Id.* ¶ 40.)

With one exception, Midwest concedes that it did not disclose or report changes in

exposure that might affect the Paycenter Policy or its premiums to LM.[7] (Def.'s Resp. to Pl.'s

Facts ¶ 41; *see* Pl.'s Facts ¶ 42 & Ex. 1 at 1-2; Reply at 2-4.) Midwest admits that "[it]

submitted only one Policy Change Request to notify LM of a change in exposure on the

Paycenter Policy." (Def.'s Resp. to Pl.'s Facts ¶ 51.) In that instance, dated June 28, 2004,

Midwest notified LM that Paycenter had a new classification of employees and additional

payroll, and in response, LM issued an endorsement and increased the premium. (Pl.'s Facts ¶

52.)

Second, the Plan provides that the insurance producer may not issue a certificate of

_____

[7] On May 25, 2004, Midwest faxed information to LM representing that Paycenter had a
total payroll exposure of $33,000 and no clients. (Def.'s Facts, Ex. 2.) This information seems
relevant to the insurance application, however, rather than a subsequent change in exposure.
(*See* Reply at 3-4.)

workers compensation insurance ("COI") unless certain conditions exist, including that "the servicing carrier is provided with a copy of each certificate." (Pl.'s Facts, Ex. 29 at P 4481-82.) Midwest acknowledges that it did not provide LM with copies of all COIs that it printed to evidence Paycenter's insurance coverage. (Def.'s Facts ¶ 7.) It specifically admits that it did not give LM a copy of a COI issued on August 9, 2004 for one of Paycenter's new clients, JK Steel. (Pl.'s Facts ¶¶ 63-64.)

Nonetheless, Midwest claims – and LM disputes – that this conduct conformed with industry standards. (Def.'s Facts ¶ 7; *see* Pl.'s Resp. to Def.'s Facts ¶ 7; Pl.'s Facts, Ex. 24, Deposition of William D. Hager, at 12-14.) According to Midwest's vice president and operations manager, Barton DeGraaf, the insurance producer provides copies of COIs only if the policy has changed, and the insured is responsible to inform the carrier of changes in exposure. (Pl.'s Facts ¶ 39 & Ex. 18, DeGraaf Dep. at 53-60.) DeGraaf, however, also testified that he was not aware of any requirements under the Plan concerning when COIs could be issued. (Pl.'s Facts, Ex. 18, DeGraaf Dep. at 56.) He further stated that Midwest has a "very limited" amount of business under the Plan, as opposed to business through the voluntary insurance market. (*Id.* at 32.)

LM conducted two audits of Paycenter during the life of the Paycenter Policy, on July 12, 2004 and again on November 19, 2004. (Pl.'s Resp. to Def.'s Facts ¶¶ 17-18; *see* Def.'s Facts, Exs. 13-14.) On both occasions, Quilici, Jr. met with LM auditors but produced no records for their review. (Def.'s Facts, Exs. 13-14.) Paul Holtrup, a Senior Forensic Consultant for LM, testified that while LM auditors ask policyholders for a variety of information during an audit (including payroll records, contracts, and invoices), they do not independently verify the

accuracy of the documents provided by the insured. (Def.'s Facts, Ex. 4, at 46-48, 59-62.)

Rather, LM auditors assume the records produced are accurate and use them to calculate

premiums. (*Id.* at 61-62.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A

genuine issue for trial exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct.

2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)

(internal quotations omitted). Once the moving party meets this burden of production, the

nonmoving party "may not rest upon the mere allegations or denials of the adverse party's

pleading" but rather "must set forth specific facts showing that there is a genuine issue [of

material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is

appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in

that party's favor. *See Anderson*, 477 U.S. at 255.

## ANALYSIS

### A.    Negligent Misrepresentation

To succeed on a claim for negligent misrepresentation under Illinois law, a plaintiff must

prove: (1) "a false statement of material fact" or omission thereof; (2) "intention to induce the

other party to act;" (3) "action by the other party in reliance on the truth of the statement[];"(4)

"damage to the other party resulting from such reliance;" (5) "the defendant's own carelessness

or negligence in ascertaining the truth of the statement;" and (6) "that defendant owes a duty to

the plaintiff to communicate accurate information."[8]  *Kopley Group V, L.P. v. Sheridan*

*Edgewater Props., Ltd.*, 376 Ill. App. 3d 1006, 1017, 876 N.E.2d 218, 228 (1st Dist. 2007); *see*

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 334-355, 843 N.E.2d 327,

332 (Ill. 2006); *Bd. of Educ. of City of Chi. v. A,C & S, Inc.*, 131 Ill. 2d 428, 452-53, 546 N.E.2d

580, 591-92 (Ill. 1989); *see LM Ins. Corp. v. Fed Equities, Inc.*, No. 05 C 1154, 2008 U.S. Dist.

LEXIS 32361, at *26 (N.D. Ill. Mar. 28, 2008); *see also Penrod v. Merrill Lynch, Pierce, Fenner*

*& Smith, Inc.*, 68 Ill. App. 3d 75, 82, 385 N.E.2d 376, 381 (3d Dist. 1979) ("Certainly, it is no

less serious for a person supplying the information to negligently omit to supply material

information which would affect a business decision of the person receiving the information.").

In its Response to LM's motion, Midwest disputes whether LM has shown that: (1)

Midwest's conduct in furthering Paycenter's application was careless or negligent; (2) it made

that misrepresentation to induce LM to act; and (3) LM's reliance on those alleged

representations was reasonable.[9]  (Resp. at 9-12.)  The parties thus agree that Midwest had a duty

to accurately disclose information to LM and that it failed to do so in certain respects.  (*See* Pl's

---

[8] In diversity jurisdiction cases, such as the one before us, we apply federal procedural law and state substantive law.  *See Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (N.D. Ill. 1999).

[9] We note that Midwest's Response with respect to the negligent misrepresentation claim focuses exclusively on the application process for the Paycenter Policy and does not address other misrepresentations allegedly committed by Midwest.  LM, on the other hand, seems to base its case largely on Midwest's alleged failures to disclose changes in exposure to the Paycenter Policy.

Facts ¶¶ 28-29, 35, 44-45, 50.) *See LM Ins. Corp.*, 2008 U.S. Dist. LEXIS 32361, at *21-23

(holding that insurance broker had a duty "to provide LM with accurate information . . . once it

volitionally interposed itself into the brokering of insurance under" the Plan).

### 1. Midwest's Alleged Negligence

Turning then to the fifth element of a negligent misrepresentation claim, we consider

whether LM has proven that Midwest was careless or negligent in stating on the application that

Paycenter was "not related through common management or ownership to any entity not listed

[thereon]." (Pl.'s Facts ¶ 28.) Midwest points out that no evidence exists demonstrating that

"anyone at Midwest knew at the time of the application, that Paycenter was designed to be

anything other than a temp agency, not a PEO; nor that there was a commonality between

ownership/management." (Resp. at 9.) Midwest ignores the undisputed fact, however, that

Blackwell – the Paycenter Policy producer for Midwest – failed to conduct any investigation into

the possible common ownership despite his prior business dealings with members of the Quilici

family. (Pl.'s Facts ¶¶ 30-31.) Rather, instead of referring to the Plan, he relied simply on his

common sense. (*Id.* ¶ 31.) While there may be a dispute as to whether Blackwell or Midwest

*actually* knew that Paycenter was related to other Quilici businesses for Plan purposes, there is

no question that Blackwell neglected to investigate this possibility. We find that this failure

constitutes "carelessness . . . in ascertaining the truth of the statement" made by Midwest in the

application. *Kopley Group V, L.P.*, 376 Ill. App. 3d at 1017, 876 N.E.2d at 228. (*See* Pl.'s Facts

¶ 28, 30.)

Even aside from the application, Midwest was careless at best in failing to inform LM of

changes in exposure to the Paycenter Policy, including providing copies of COIs. It is

undisputed that Midwest owed a duty to LM to report "immediately to the assigned carrier all

known changes in the employer's name, operations, ownership status, exposures, locations,

financial condition or other changes which may affect the policy or the services being provided."

(Pl.'s Facts, Ex. 29 at P 4439.)  The Plan also obligated Midwest to give LM copies of all COIs it

issued for the Paycenter Policy.  (*Id.* at P 4481-82.)  Midwest acknowledges that, with one

exception, it did not report such changes, nor did it provide LM with copies of COIs that it

generated for Paycenter.  (Def.'s Resp. to Pl.'s Facts ¶ 51; Def.'s Facts ¶ 7.)  Midwest's vice

president, DeGraaf, testified that he did not know of any particular requirements for issuing

COIs under the Plan and that Midwest did little business in the involuntary market governed by

it.  (Pl.'s Facts, Ex. 18, DeGraaf Dep. at 53-60.)  Blackwell stated that he did not think he had

read the Plan's rules and regulations.  (Pl.'s Facts, Ex. 16, Blackwell Dep. at 18.)  Midwest thus

omitted material facts concerning changes in exposure and withheld information from LM about

the COIs it issued, without seriously considering what regulations might apply for such

transactions.  Given these undisputed facts, Midwest's failure to become familiar with and abide

by the Plan's requirements for its business was negligent.

### 2.    Midwest's Alleged Intent to Induce LM's Actions

We next determine whether LM has proven that Midwest engaged in its

misrepresentations and omissions with an intent to induct Midwest to act.[10]  *Kopley Group V,*

*L.P.*, 376 Ill. App. 3d at 1017, 876 N.E.2d at 228.  We agree with LM that Midwest's preparation

and submission of the insurance application – with its misrepresentation about Paycenter's

---

[10]  In a short, two-sentence paragraph, Midwest contends that the case cited for this
proposition by LM is inapposite but offers no legal argument or evidence of its own.  (Resp. at
10.)

commonality with other Quilici-owned businesses – demonstrates its intent that LM issue the

Paycenter Policy. *See Liberty Mut. Ins. Co. v. Decking & Steel, Inc.*, 301 F. Supp. 2d 830, 835

(N.D. Ill. 2004) (observing that the "purpose of the [insurance] application" was to induce the

insurance carrier to act). Obviously, Midwest stood to benefit if it successfully obtained

insurance coverage for its client. There would be no practical reason to submit an application

unless Paycenter and Midwest intended for LM to consider issuing an insurance policy.

Accordingly, and at least with respect to the application allegations, we find that LM has met its

burden of proof on this issue.[11]

### 3. LM's Reliance on Midwest's Misrepresentations and Omissions

Although Midwest does not expressly challenge LM's assertion that it relied on

Midwest's representations in the application and thereafter, it contends that such reliance was

unreasonable. (Resp. at 11-12.) Midwest argues that, "[e]ven if [it] is guilty of some omissions,

and it has admitted that its actions herein were not fully to the letter of the law, LM's apparent

refusal to use its own information, and to follow its own instincts, . . . calls into question its

asserted reliance." (*Id.* at 11.)

In support of its contention, Midwest points to several undisputed facts. First, as of May

21, 2004, LM employees in the special investigations unit were aware that Louis Quilici

presented a new insurance application under a new business name, Paycenter. (Def.'s Facts, Ex.

7 at P 78.) The documentary evidence submitted by Midwest shows that LM employees

---

[11] The question of whether LM has shown Midwest's intent underlying its failures to inform LM of changes in exposure and issue COIs is a closer call, and one we need not reach today.

immediately recognized that Louis Quilici also was affiliated with EMCO.[12]  (*Id.* at P 77-78.)

This evidence raises a question as to whether LM reasonably relied on Midwest's

misrepresentation in the Paycenter application regarding its affiliation with other entities.  (*See*

*also id.* at P 76 (Holtrup writing in July 13, 2004 email to auditors that "they [Paycenter and

EMCO] may be combinable.  We will need to look into further.").)

Second, the record indicates that LM conducted two audits of Paycenter, on July 12,

2004 and November 19, 2004.  (Pl.'s Resp. to Def.'s Facts ¶¶ 17-18; Def.'s Facts, Exs. 13-14.)

Quilici, Jr. attended both audits but did not produce records for the LM auditors to review.

(Def.'s Facts, Exs. 13-14).  The auditor on July 12, for example, noted that "[a]ccording to the

insured at this time, no records are available."  (Def.'s Facts, Ex. 13 at P 836.)  The audit report

states that Paycenter had a project coming up the following month with the Chicago Public

Schools involving fourteen employees.  (*Id.*)  It also added that as of July 6, 2004, Quilici, Jr.

had hired six IT employees for jobs with two other clients, Scientific Window and Omron.  (*Id.*)

In an email to other LM employees, including Holtrup, the auditor forwarded the July 2004

"'audit' worksheets" and commented that "it is a misnomer since we didn't 'audit' anything."

(Def.'s Facts, Ex. 7 at P 77.)

Four months later at the November audit, Quilici, Jr. "could not produce invoices for the

audit, but advise[d] that business is picking up."[13]  (Def.'s Facts, Ex. 14 at P 820.)  The

---

[12] This evidence – an email – does not indicate if LM knew whether Quilici, Jr. or
Quilici, Sr. had submitted the insurance application.  (Def.'s Facts, Ex. 7 at P 78.)

[13] Apparently Quilici, Jr.'s failure to comply with LM audit and/or loss prevention
department requests caused LM to cancel the Paycenter Policy, effective December 29, 2004.
(Def.'s Facts, Ex. 15.)  LM notified Paycenter and Midwest of the cancellation by letter dated
October 25, 2004.  (*Id.*)  LM later rescinded the request to cancel on January 13, 2005.  (Def.'s

November audit also identifies three current or anticipated clients, including Scientific Window and Omron mentioned in the earlier audit report. (*Id.*) The parties have not identified any evidence in the record showing whether LM pressed Quilici, Jr. in November for information about clients, despite the fact that he had not provided documentation about clients previously disclosed in July. The evidence before us thus raises a question of fact concerning LM's reliance on Midwest's misrepresentations about Paycenter's exposure, where LM conducted audits of Paycenter and seemed satisfied with Quilici, Jr.'s meager responses despite the lack of documentation at Paycenter.

In Illinois, the issue of whether a plaintiff's reliance is justified is typically a factual question left for the jury to decide. *See LM Ins. Corp.*, 2008 U.S. Dist. LEXIS 32361, at \*28; *Kopley Group V, L.P.*, 376 Ill. App. 3d at 1018, 876 N.E.2d at 229. The reasonableness of a plaintiff's reliance becomes a question for the court only if "it is apparent from the undisputed facts that only one conclusion can be drawn." *Kopley Group V, L.P.*, 376 Ill. App. 3d at 1018, 876 N.E.2d at 229. Based on the documents discussed above – and drawing all inferences in Midwest's favor – we hold that a reasonable jury could infer that LM had independent knowledge: (1) of Paycenter's affiliation with EMCO and/or EMCO-IL; and (2) that Paycenter was expanding its business without seeking endorsements from LM or otherwise updating them on new potential liability. *See, e.g., LM Ins. Corp.*, 2008 U.S. Dist. LEXIS 32361, at \*28-29. Although we cannot predict whether these facts ultimately might persuade a jury that Midwest is not liable for its carelessness, we conclude that it is the jury who must decide.

---

Facts, Ex. 16.)

**B.      Negligence**

For similar reasons, we deny LM's motion with respect to the negligence claim against

Midwest.  "To prevail in an action for negligence, the plaintiff must establish that the defendant

owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries

proximately caused by the breach." *Adams v. N. Ill. Gas Co.*, 211 Ill. 2d 32, 43, 809 N.E. 2d

1248, 1257 (Ill. 2004).  As LM accurately states, and as discussed above, there is no question

that Midwest owed it a duty of care under the Plan and subsequently breached that duty.  (Mem.

at 13-14.)  Like the reasonableness of a plaintiff's reliance, however, "proximate cause is

ordinarily a question for the jury to decide," *LM Ins. Corp.*, 2008 U.S. Dist. LEXIS 32361, at

*30, unless "reasonable people could not differ as to the inferences to be drawn from the

undisputed facts," *Lawrence v. Bridgestone/Firestone, Inc.*, 963 F. Supp. 685, 687 (N.D. Ill.

1997).  *See also Merlo v. Pub. Serv. Co. of N. Ill.*, 381 Ill. 300, 318, 45 N.E.2d 665, 675 (Ill.

1943) (stating that "the proximate cause of an injury . . . is ordinarily a question of fact" and may

"be a question of law when the facts are not only undisputed but are also such that there can be

no difference in the judgment of reasonable [people] as to the inferences to be drawn from

them").  While most of the facts here are undisputed, it is possible that reasonable people could

draw different inferences and conclusions as to whether Midwest proximately caused LM's

injury of lost premiums.

**CONCLUSION**

For the reasons set forth above, we deny LM's Motion for Partial Summary Judgment on

Counts 14 and 15 against Midwest.  It is so ordered.

Honorable Marvin E. Aspen
U.S. District Court Judge


Dated: October 22, 2008